# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00317-CR

**Bennie Fuelberg, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT
### NO. CR01015, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Bennie Fuelberg guilty of misapplication of fiduciary property, theft, and money laundering. *See* Tex. Penal Code §§ 31.03, 32.45, 34.02. The jury assessed punishment at ten years' imprisonment for each offense, but recommended that the sentences be suspended and Fuelberg be placed on community supervision. In seven appellate issues, Fuelberg asserts that (1) the trial judge, the Honorable Daniel H. Mills, was disqualified from the case; (2) the assigned judge abused his discretion in failing to recuse Judge Mills; (3) the trial court abused its discretion in admitting testimony of two of the State's witnesses; and (4) the trial court erred in its determination of restitution. We affirm the judgment of the trial court.

## BACKGROUND

The facts of this case are discussed in this Court's prior opinion in *Fuelberg v. State*, 410 S.W.3d 498, 501–02 (Tex. App.—Austin 2013, no pet.). We repeat only those facts that are relevant to our disposition of this appeal.

### Factual background

The Pedernales Electric Cooperative (PEC) is a member-owned utility that provides electrical service to twenty-four counties in Central Texas. *See* Tex. Util. Code §§ 161.001–.254 (describing formation and operation of utility cooperatives). Any resident in the PEC's service area is required to join the PEC in order to receive electric service, and as of 2008 the PEC had over 225,000 members. Fuelberg was the general manager of the PEC from 1976 until his retirement in February 2008, and he was given broad authority to oversee its day-to-day operations.

The State alleges that between November 1996 and March 2007, Fuelberg conspired with Walter Demond to funnel over $200,000 in PEC funds to Fuelberg's brother Curtis and William Price, the son of a former PEC board member.[1] Demond was a partner at Clark, Thomas & Winters, PC (Clark Thomas), a law firm that had represented the PEC for several decades. According to Larry McNeil, the president of Clark Thomas, Demond was the law firm's informal chief financial officer and head of the "energy group," which was the section of Clark Thomas that handled the PEC's representation. Fuelberg was Demond's primary contact at the PEC, and the PEC paid Clark Thomas an average of $900,000 per year for its legal services.

---

[1] We refer to Curtis Fuelberg by his first name to avoid confusion.

2

According to the State, Fuelberg instructed Demond to hire Curtis as a consulting lobbyist for Clark Thomas and then have Clark Thomas bill the PEC to pay Curtis's salary. The State introduced evidence that between October 1996 and December 2003, Clark Thomas billed the PEC $30,000 every six months to cover "the PEC's share" of Curtis's salary.[2] Similarly, the State alleged that beginning in 2003, Fuelberg instructed Demond to keep Price on retainer as counsel for Clark Thomas. The State introduced evidence that Clark Thomas paid Price $2,000 per month and then billed the PEC for most of those payments. Finally, the State introduced evidence that from January 2004 through March 2007, Demond billed the PEC $7,000 per month to cover both Price's retainer and Curtis's salary. All told, the state's forensic accountant testified that the PEC paid Clark Thomas $630,000 for Curtis's salary and $86,000 for Price's retainer.[3]

At trial, PEC board members testified that they never knew about or approved Fuelberg's payment of PEC funds to Curtis or Price. Price also testified that he did not know that his retainer was being paid with PEC's money. Finally, Curtis testified that he did not learn that his income from Clark Thomas was being paid with PEC funds until 2002 or 2003. The State also introduced evidence that when the PEC's Human Resources Director asked Clark Thomas to explain the $7,000 monthly payments, Fuelberg told Demond to ignore that request and send billing invoices directly to Fuelberg for approval.

---

[2] Clark Thomas initially paid Curtis $5,000 per month, but his salary ultimately increased to $7,000 per month. The PEC's $30,000 semiannual payment to Clark Thomas did not increase, and therefore the PEC was not reimbursing Clark Thomas for all of Curtis's salary.

[3] There is conflicting evidence about whether Curtis did any actual work as a lobbyist for the PEC. Price, however, testified that he never performed any work for the PEC or Clark Thomas despite asking Demond several times if there was any work that he could do.

3

David Duggins, another partner at Clark Thomas, testified that he spoke with Demond about their firm's payments to Curtis and Price in November or early December 2007. According to Duggins, Demond assured him that the PEC was not being billed for Curtis's or Price's work. Two months later, however, Duggins "heard a reference made to PEC's share of these payments," and he asked Demond "what is this about PEC's share?" Duggins testified that Demond showed him an invoice for the $7,000 per month that the PEC was paying to Clark Thomas, which Demond explained was for the PEC's share of Clark Thomas's payments to Curtis and Price. Demond told Duggins that Fuelberg instructed him to conduct this billing arrangement and that Fuelberg assured Demond that the PEC Board of Directors had approved the arrangement. However, when Duggins asked Demond for written proof of the PEC board's approval, Demond stated that he had none.

Fuelberg retired from the PEC in February 2008. One month later, the PEC's new general manager hired Navigant Consulting to investigate and prepare a report about the PEC's outside consulting expenditures during Fuelberg's tenure. Part of Navigant's investigation included PEC's payments to Clark Thomas. On December 15, 2008, Navigant issued its report (the Navigant Report), detailing Fuelberg and Demond's alleged scheme to transfer PEC funds to Curtis and Price through Clark Thomas.

A few days before the Navigant Report was issued, a PEC representative who was helping prepare the Navigant Report contacted Demond to discuss Clark Thomas's billing. According to the PEC representative, Demond did not provide an explanation for the $30,000 semiannual payments at the time—the same payments that were allegedly used to cover Curtis's lobbying salary as outlined above. Duggins testified that Demond called him to discuss the PEC's

4

investigation, explained the purpose of the $30,000 payments, and stated that he was not sure what to tell the PEC. Duggins told Demond that they needed to meet with McNeil to discuss the situation. Duggins and McNeil testified that at that meeting, Demond explained the full extent of Clark Thomas's payments to Curtis and Price and how the firm was billing the PEC for its share of these expenses.

**Procedural history**

Seven months after the Navigant Report was issued, Fuelberg and Demond were each indicted for first-degree felony misapplication of fiduciary property, first-degree felony theft, and second-degree felony money laundering. *See* Tex. Penal Code §§ 31.03(e)(7) (making theft a first-degree felony if value of property stolen was more than $200,000), 32.45(c)(7) (same punishment range for misapplication of fiduciary property), 34.02(e)(3) (making money laundering a second-degree felony if value of fund is more than $100,000 but less than $200,000). Prior to trial, Fuelberg and Demond filed motions to disqualify or, alternatively, recuse Judge Mills from their respective cases. The motions asserted that as a PEC member, Judge Mills had a personal and pecuniary interest in this case and that a reasonable person might question Judge Mills's impartiality. Judge Mills declined to voluntarily recuse himself and referred the motions to the presiding judge, who assigned the motions to the Honorable Bert Richardson. *See* Tex. R. Civ. P. 18a (prescribing procedure for resolving motions to disqualify and recuse). Judge Richardson conducted a hearing, after which he denied Fuelberg's and Demond's motions.

Fuelberg and Demond were tried separately, with Fuelberg's trial taking place three months before Demond's. In Fuelberg's trial, the State called a total of nineteen witnesses, including

5

Duggins and McNeil, who testified about their conversations with Demond outlined above. Fuelberg called a total of eight witnesses, including his brother Curtis, who testified about the work he performed for Clark Thomas. Finally, Fuelberg testified in his own defense, asserting that he had the authority to pay Curtis for consultant work and therefore there was nothing improper in his doing so through Clark Thomas. Fuelberg also stated that he did not know that Demond was charging the PEC for Price's retainer.

The jury found Fuelberg guilty of third-degree misapplication of fiduciary property, theft, and money-laundering, meaning that the value of the property misapplied, stolen, and laundered was between $20,000 and $100,000. *See* Tex. Penal Code §§ 31.03(e)(5), 32.45(c)(5), 34.02(e)(2). The jury assessed punishment at ten years' imprisonment for each offense, but recommended that the sentence be suspended and Fuelberg be placed on community supervision. The trial court rendered a judgment consistent with the jury's verdict and also ordered Fuelberg to pay $126,000 in restitution.[4] This appeal followed.

**DISCUSSION**

Fuelberg raises seven issues on appeal, which we group into the following four categories. First, Fuelberg asserts that Judge Mills was disqualified from presiding over this case because (a) as a PEC member, he has a pecuniary interest in the subject matter of the case and (b) as a PEC member, he is a "party injured" within the meaning of article 30.01 of the Code of Criminal

---

[4] The trial court also ordered Fuelberg to serve a total of 300 days in the Blanco County Jail as a condition of his community supervision. *See* Tex. Code Crim. Proc. art. 42.12, § 12(a) (authorizing judge to require defendant on community supervision for a felony offense to submit to confinement in county jail as condition of community supervision).

Procedure. *See Fuelberg*, 410 S.W.3d at 503 (discussing Fuelberg's disqualification claims). Second, Fuelberg argues that Judge Richardson erred in denying Fuelberg's motion to recuse Judge Mills. Third, Fuelberg complains that Duggins's and McNeil's testimony about their conversations with Demond constituted hearsay and violated the Confrontation Clause. Fourth, Fuelberg claims that the trial court abused its discretion in ordering restitution higher than the amount reflected in the jury's verdict. We will address each issue separately.

**Disqualification and recusal**

In our prior opinion, we overruled Fuelberg's assertion that Judge Mills had a disqualifying pecuniary interest in this case. *See id.* at 504–07. However, we remanded the case to Judge Richardson to determine "whether, under an objective reasonable-person standard, Judge Mills (1) was disqualified as an interested party . . . or (2) should have been recused because his impartiality might reasonably be questioned." *Id.* at 511 (citing *Whitehead v. State*, 273 S.W.3d 285, 286 (Tex. Crim. App. 2008); Tex. R. Civ. P. 18b(b)(1)). On remand, Judge Richardson conducted a second disqualification and recusal hearing. Following that hearing, Judge Richardson again denied Fuelberg's motion to disqualify and recuse Judge Mills.

Fuelberg argues that Judge Mills was disqualified under article 30.01 of the Code of Criminal Procedure, which states that a judge is disqualified from sitting in "any case where he may be the party injured." As we discussed in our prior opinion, Judge Mills "is an injured party, if at all, because he was a victim in the criminal transaction or episode at issue such that a reasonable person would doubt his impartiality." *Id.* at 508 (citing *Whitehead*, 273 S.W.3d at 286). "The objective reasonable-person standard for disqualification" as an injured party is "identical to the

7

objective reasonable-person standard for recusal under rule 18b(b)(1)." *Id.* (comparing *Whitehead*, 273 S.W.3d at 286, *with Ex parte Ellis*, 275 S.W.3d 109, 115–17 (Tex. App.—Austin 2008, no pet.)). Therefore, in addressing either disqualification under article 30.01 of the Code of Criminal Procedure or recusal under section 18b(b)(1) of the Rules of Civil Procedure, the ultimate issue is the same—would "a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge and the case, . . . have a reasonable doubt that the judge is actually impartial[?]" *Ex parte Ellis*, 275 S.W.3d at 116 (internal quotations omitted).

This objective reasonable-person standard "is concerned not only with actual personal or pecuniary interests, but also the appearance of impartiality." *Fuelberg*, 410 S.W.3d at 509. "[B]eyond the demand that a judge be impartial is the requirement that a judge appear to be impartial so that no doubts or suspicions exist as to the fairness or integrity of the court." *Sears v. Olivarez*, 28 S.W.3d 611, 614 (Tex. App.—Corpus Christi 2000, no pet.); *see also Rogers v. Bradley*, 909 S.W.2d 872, 873 (Tex. 1995) ("Declaration of Recusal" by Gammage, J.) (noting that issue is one of perception). The determination of whether a reasonable person would doubt Judge Mills's impartiality "should be based on a studied analysis of all of the circumstances involved rather than a knee-jerk reaction to one fact in isolation." *Ex parte Ellis*, 275 S.W.3d at 116.

"Courts enjoy a presumption of judicial impartiality." *Id.* at 117 (internal quotations omitted). This presumption stems from "the notion that the conscientious judge will, as far as possible, make himself aware of his biases . . . and, by that very self-knowledge, nullify their effect." *See Liteky v. Unites States*, 510 U.S. 540, 562 (1994) (Kennedy, J., concurring) (internal quotations omitted). As Justice Kennedy explained, "[t]he acquired skill and capacity to disregard extraneous

8

matters is one of the requisites of judicial office." *Id.* Therefore, a "party seeking recusal"—and, by extension, disqualification under article 30.01 of the Code of Criminal Procedure—"must satisfy a high threshold before a judge must be recused." *See Ex parte Ellis*, 275 S.W.3d at 116 (internal quotations omitted). We review Judge Richardson's denial of Fuelberg's motion to disqualify and recuse Judge Mills for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 120 (Tex. Crim. App. 2000). Therefore, we will only reverse Judge Richardson's ruling if it is outside the zone of reasonable disagreement. *Id.*

In this case, Judge Mills's potential interests in the PEC generally and this case specifically can be grouped into two categories—pecuniary and personal. As we explained in our prior opinion, Judge Mills's only pecuniary interest in the PEC "is in the rates that he pays, or should have paid, for utility service, which is indistinguishable from the interest of a public utility customer." *Fuelberg*, 410 S.W.3d at 506; *see also* Tex. R. Civ. P. 18b(d)(4)(E) ("[A]n interest as a taxpayer or utility ratepayer, or similar interest, is not a 'financial interest' unless the outcome of the proceeding could substantially affect the liability of the judge . . . more than other judges."). Similarly, Judge Mills's pecuniary interest in the outcome of this case is very attenuated "because he stood to gain only if Fuelberg was convicted; Judge Mills in his discretion, ordered Fuelberg to pay restitution; the PEC increased the allocations to its members' capital credit accounts based on that restitution; and then the PEC Board, in its discretion, approved a distribution to its members from the increase in their capital credit accounts." *Fuelberg*, 410 S.W.3d at 506. Even if all of those events occurred, Judge Mills stood to gain $5.00 at most from any potential restitution. Having already determined that Judge Mills's pecuniary interest in this case does not support his

9

disqualification, we turn to the issue of whether Judge Mills's personal interests in this case require disqualification or recusal.

Judge Mills's potential personal interest in this case can best be understood as his status as a putative victim of the underlying offenses. *See id.* at 507–08. Fuelberg argues that although Judge Mills is not the victim named in the indictment, as a PEC member he was "among the defendant's victims in the criminal transaction or episode at issue." *See Whitehead*, 273 S.W.3d at 289. Judge Mills's status as a putative victim of Fuelberg's theft, misapplication of fiduciary property, and money laundering could require disqualification or recusal if it would lead a reasonable person to question Judge Mills's ability to remain impartial. *See Fuelberg*, 410 S.W.3d at 507–08.

On remand, Fuelberg introduced expert testimony from Jeffrey Alan Smith, a professional pollster and statistician who has conducted over 400 public opinion polls in his career. Smith testified that he conducted a random survey of 402 adult residents of Bandera County, Texas, who are all customers of the Bandera Electric Cooperative.[5] The survey included the following relevant statements and questions:

> An electric utility cooperative is a non-profit organization that provides utility services to its members. It is overseen by a manager and board of directors whose duty is to operate the utility for its members' benefit. Members have an interest in the efficient management of the co-op that they trust management to protect . . . .

---

[5] According to the State, the Bandera Electric Cooperative has approximately 23,000 members, and therefore is less than 10% the size of the PEC. Smith explained that he chose to interview members of the Bandera Electric Cooperative because he believed they would have "at least a passing familiarity with the concept of an electric co-op" but they would not be "tainted by this particular case."

10

Suppose that the manager of an electric co-op had conspired with the co-op's legal advisor to steal a great deal of co-op funds for their own benefit. Would you consider the co-op members to have been harmed by this theft and breach of trust, even if the financial impact on individual customers was minimal?

. . . .

Suppose that the judge in that trial was a member of the same co-op that the defendants were accused of stealing from. Would it be reasonable to have concerns about the judge being fair and unbiased in that particular case?

According to Smith, 87.6% of those surveyed stated that they believe the members would be harmed by the theft and breach of trust. Furthermore, 70.6% of those surveyed stated that it would be reasonable to have concerns about the judge being fair and unbiased. Smith stated that the poll had a 4.9% margin of error.

Although this statistical evidence is somewhat related to the recusal issue, as Judge Richardson correctly noted in his findings of fact, Smith's survey "did not fully put forward the 'reasonable person' test required to be answered for recusal" and disqualification under *Whitehead*, 273 S.W.3d at 286. First, the survey did not provide all of the relevant facts concerning Judge Mills and this case. *See Ex parte Ellis*, 275 S.W.3d at 116. Among other things, the survey does not mention that the hypothetical utility co-op has over 225,000 members; everyone who lives in the co-op's service area is required to join the co-op; the hypothetical judge could receive at most $5 in restitution from this case; and that restitution would occur only if the co-op's board of directors, in its discretion, increased the allocation to all of the members' capital accounts and then approved distribution from those capital account to the members. *See Fuelberg*, 410 S.W.3d at 506 (discussing Judge Mills's attenuated financial interest in this case).

11

Furthermore, Smith's survey does not pose the appropriate legal question—i.e., whether the survey participant would doubt the hypothetical judge's impartiality. *See Ex parte Ellis*, 275 S.W.3d at 116 (noting correct question is whether member of public would reasonably doubt judge's impartiality). Rather, it asks the survey taker whether "it would be reasonable to have *concerns* about the judge's impartiality." Judge Richardson could have reasonably believed that "concern" is not an appropriate synonym for "doubt," and therefore Smith's survey failed to accurately gauge whether the average survey taker would doubt the hypothetical judge's ability to remain impartial.

Finally, as Judge Richardson correctly noted in his findings of fact, the "'reasonable person' standard is a legal standard," and "evidence derived from survey results attempting to ascertain public opinion related to judicial bias" is not controlling. A reasonable person is "[a] hypothetical person used as a legal standard . . . [and] 'is not necessarily the same as the average man—a term which implies an amalgamation of counter-balancing extremes.'" Black's Law Dictionary 1380 (9th ed. 2009) (quoting R.F.V. Heuston, *Salmond on the Law of Torts* 56 (17th ed. 1977). "[J]udges determine appearance of impropriety—not by considering what a straw poll of the only partly informed man-in-the-street would show—but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988). Therefore, although the opinion of the average person is related to the opinion of the hypothetical reasonable person, the terms are not synonymous, and public polling is not a substitute for an appropriate legal analysis of the reasonable-person standard.

12

Given that Smith's survey did not provide all of the relevant facts concerning Judge Mills and this trial, the survey did not ask survey takers whether they would doubt the hypothetical judge's impartiality, and surveys generally are not a substitute for the reasonable-person standard, Judge Richardson could have reasonably discounted this survey's probative value. Having determined the relative weight—or lack thereof—of Smith's survey, we turn to Fuelberg's remaining arguments concerning recusal and disqualification.

First, Fuelberg notes that during its closing argument, the State asserted that by stealing from the PEC, Fuelberg was really stealing from "the farmer in Blanco County, the storekeeper in Marble Falls, the homeowner in suburban Austin." In short, the State argued that Fuelberg was stealing from every PEC member, a group which includes Judge Mills. Fuelberg contends that this argument underscores the fact that—even by the State's own admission—all PEC members were the victims of Fuelberg's alleged theft, and therefore Judge Mills was disqualified as a victim.

As we explained in our previous opinion, Judge Mills is disqualified as a party injured if he was a victim of this underlying offense "such that a reasonable person would doubt his impartiality." *See Fuelberg*, 410 S.W.3d at 508. Therefore, the fact that the State characterizes PEC members as victims of Fuelberg's theft does not end the relevant inquiry. The State might similarly characterize taxpayers as victims of public corruption or members of the public generally as victims of insider trading, even though such ubiquitous injuries would not necessarily support a judge's disqualification or recusal. *See Lane v. State*, 634 S.W.2d 65, 66 (Tex. App.—Fort Worth 1982, no pet.) (concluding that judge was not disqualified from presiding over perjury trial where perjury was

13

committed in judge's court). Therefore, the fact that the State chose to characterize PEC members as victims of Fuelberg and Demond's conspiracy does not meaningfully address whether a reasonable person would question Judge Mills's impartiality.

Second, Fuelberg asserts that the venue in this case was transferred from Blanco County, at least in part, based on concerns that the jurors were likely PEC members and therefore may be biased against the defense. *See generally* Tex. Code Crim. Proc. art. 31.03(a)(1) (stating defendant can file motion to change venue if there exists "so great a prejudice against him that he cannot obtain a fair and impartial trial."). According to Fuelberg, this change of venue underscores the fact that membership in the PEC raises concerns of bias or impartiality which would be equally applicable to Judge Mills.

Fuelberg concedes that venue was transferred in this case by consent of the parties, and thus the trial court never found that the prejudice against Fuelberg was so great that he could not receive a fair and impartial trial in Blanco County.[6] *Compare id.* art. 31.03(a)(1), *with id.* art. 31.03(b) (stating venue may be transferred "upon motion of the defendant and with the consent of the attorney for the state" for convenience of the parties or in the interest of justice). However, even if venue had been transferred based on a concern of a tainted jury pool, it does not necessarily follow that Judge Mills should be recused. Judges enjoy a presumption of impartiality, and exercising the ability to disregard extraneous information is one of the skills that is expected of the judiciary. *See Ex parte Ellis*, 275 S.W.3d at 116. Therefore, the same extraneous knowledge that might support

_____

[6] The State asserts that the parties agreed to transfer venue because this case received a high level of press coverage in Blanco County.

14

disqualifying a juror or even transferring venue might not support recusing a trial judge. *See id.* (noting that party seeking to recuse judge must satisfy high threshold).

Finally, and perhaps most persuasively, Fuelberg notes that Judge Mills was among the participants in the "Worrall Suit"—a class-action lawsuit brought on behalf of all PEC members against the PEC, Fuelberg, and various PEC officers and directors. The plaintiffs in the Worrall Suit alleged that the defendants breached their fiduciary duties by, among other things, "failing properly to oversee, object to and prevent Fuelberg's . . . lavish self-dealing"; failing to manage, invest, and dispose of PEC members' "capital credit accounts"; and negligently purchasing a for-profit software subsidiary. *See Fuelberg*, 410 S.W.3d at 505 (explaining function of PEC members' capital credit accounts). Judge Mills did not opt out of the Worrall Suit, which was settled by the parties. Judge Mills stated that he did not participate in the Worrall Suit beyond not opting out, that he "did not pretend to know all the terms and conditions" of the suit, and that he only vaguely knew the terms of the settlement agreement. According to the PEC's Chief Financial Officer, Judge Mills had received a distribution from his capital credit account for approximately $18, and under the terms of the settlement agreement, Judge Mills and all other PEC members would likely be receiving additional, nominal distributions in the future.

We recognize that some of the allegations in the Worrall Suit relate to the underlying facts of Fuelberg's criminal trial. However, Judge Mills's financial interest in the settlement of that lawsuit is the same pecuniary interest that we determined was not disqualifying because it is "indistinguishable from the interest of a public utility customer." *See id.* at 506; *see also Gulf Mar. Warehouse Co. v. Towers*, 858 S.W.2d 556, 558 (Tex. App.—Beaumont 1993, writ denied) (noting that pecuniary interest requiring disqualification means same thing as financial interest that might

15

support recusal). The financial compensation that Judge Mills received from the suit is generally the same type of rebate that a public utility customer would receive for previous overpayments. *See Fuelberg*, 410 S.W.3d at 505. Ultimately, there is evidence in the record that Judge Mills did not actively participate in the Worrall Suit, that his interest in this case was indistinguishable from that of the other 225,000 PEC members, that any resident in the PEC's coverage area had to purchase his electricity from the PEC, and that Judge Mills stood to gain $5.00 at most from any restitution that he ordered in this case in addition to the approximately $18 he received under the terms of the Worrall settlement.

Based on the record as a whole, Judge Richardson could have reasonably concluded that a reasonable person would not doubt Judge Mills's ability to remain impartial. *See Ex parte Ellis*, 275 S.W.3d at 116 (noting that courts determine whether judge should be recused "based on a studied analysis of all of the circumstances involved rather than a knee-jerk reaction to one fact in isolation."). Therefore, we cannot say that Judge Richardson abused his discretion in denying Fuelberg's motion to disqualify and recuse Judge Mills. We overrule Fuelberg's first and second appellate issues.

**Admissibility of Duggins's and McNeil's testimony**

In his third, fourth, fifth, and sixth issues on appeal, Fuelberg asserts that the trial court erred in overruling his objections to Duggins's and McNeil's testimony. Specifically, Fuelberg claims that Duggins's and McNeil's testimony about their conversations with Demond constituted inadmissible hearsay that does not fall within a recognized exception. *See generally* Tex. R. Evid. 801–04. Furthermore, Fuelberg argues that the witnesses' testimony violated the

16

Confrontation Clause because Fuelberg could not confront Demond about his out-of-court statements. *See generally* U.S. Const. amend. VI. We address Fuelberg's hearsay and confrontation-clause arguments separately.

*Hearsay*

In his third and fifth issues on appeal, Fuelberg complains that Duggins's and McNeil's testimony about their prior conversations with Demond should have been excluded as hearsay. We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We will uphold the trial court's decision if it is supported by the record and is correct under any theory of applicable law. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). Generally, a hearsay statement is not admissible unless the statement falls within a recognized exception to the hearsay rule. *See Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011). The State asserts that Duggins's and McNeil's testimony about what Demond told them is not hearsay because it constitutes an admission by Fuelberg's co-conspirator "during the course and in furtherance of the conspiracy." *See* Tex. R. Evid. 801(e)(2)(E) (defining admissions of party-opponent's co-conspirator as not hearsay).

"To come within [the co-conspirator] rule, the State must show that a conspiracy existed, that the co-conspirator was a member of or participated in the conspiracy, and that the statement was made to advance or facilitate the conspiracy." *Maynard v. State*, 166 S.W.3d 403, 411 (Tex. App.—Austin 2005, pet. ref'd). "Statements made in furtherance of a conspiracy include

17

attempts to induce others to cooperate with or assist co-conspirators; attempts to induce another to join or continue with the conspiracy; discussions related to concealment of the conspiracy; or conversations to identify the roles of the conspirators." *Id.*

At trial, the State asserted that Fuelberg conspired with Demond to funnel PEC funds to Curtis and Price. The State also argued that as part of this underlying conspiracy, Fuelberg and Demond conspired to conceal these payments from the PEC board by not identifying who was performing the work for which Clark Thomas was billing. Fuelberg claims that any alleged conspiracy between himself and Demond ended when Clark Thomas made its final payments to Curtis and Price in March 2007. Therefore, according to Fuelberg, Demond's statements to Duggins and McNeil could not have been in furtherance of the conspiracy because those statements were not made until November 2007, January 2008, and December 2008.

Although Fuelberg may be correct that the primary objective of the alleged conspiracy—i.e., funneling PEC funds to Curtis and Price—ended when Clark Thomas stopped making the relevant payments, the State introduced evidence that Fuelberg and Demond engaged in a conspiracy, which continued until the Navigant Report was issued in mid-December 2008, to hide those payments. *See Forman v. United States*, 361 U.S. 416, 423–24 (1960) (concluding evidence supported assertion that conspiracy to evade taxes continued for eight years after last fraudulent tax return was filed because concealment had to continue if evasion was to succeed), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 18 (1978).[7] "Concealment is sometimes a necessary

---

[7] When, as here, the Texas Rules of Evidence are patterned on their federal counterparts, we find it appropriate to look to federal cases and commentary for guidance. *See Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008).

part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy." *United States v. Mann*, 161 F.3d 840, 857 (5th Cir. 1998). Thus, the fact that Demond's statements to Duggins and McNeil occurred after the underlying theft, misapplication of fiduciary property, and money laundering were completed does not mean that those statements were not in furtherance of Demond's alleged conspiracy with Fuelberg. *See United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997) ("It is irrelevant that the [co-conspirator's statements were] not made within the time frame charged in the indictment.").

The State introduced testimony that in 2004, Fuelberg instructed Demond not to respond to the PEC's request for an explanation of Clark Thomas's $7,000 monthly bill that paid for Curtis's salary and Price's retainer. Similarly, Duggins testified that during his conversation with Demond in November 2007, Demond told Duggins that none of Curtis's or Price's payments were being paid with PEC funds. Finally, both McNeil and Duggins testified that days before the Navigant Report was issued, Demond finally explained his arrangement with Fuelberg to have Clark Thomas pay Curtis and Price and then bill the PEC for the majority of those payments. Demond's alleged statements to McNeil and Duggins could arguably be seen as an attempt to encourage them to help Demond conceal the conspiracy in order to protect Clark Thomas.

Based on this record, the trial court could have reasonably concluded that Demond's statements to Duggins and McNeil were in the course of and in furtherance of a conspiracy between Demond and Fuelberg to conceal theft, misapplication of fiduciary property, and money laundering from the PEC. Therefore, we cannot conclude that the trial court abused its discretion in admitting Duggin's and McNeil's testimony as a non-hearsay admission by a co-conspirator. We overrule Fuelberg's third and fifth appellate issues.

19

*Confrontation Clause*

In his fourth and sixth issues on appeal, Fuelberg asserts that Duggins's and McNeil's testimony concerning Demond's previous out-of-court statements violated the Confrontation Clause. Specifically, Fuelberg argues that he could not cross-examine Demond about the statements because Demond could invoke his right to remain silent. *See* U.S. Const. amend. V; *Mendez v. State*, 56 S.W.3d 880, 892 (Tex. App.—Austin 2001, pet. ref'd) (introducing confession of non-testifying accomplice violated defendant's Sixth Amendment rights).

The Confrontation Clause to the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U. S. Const. amend. VI. Generally, courts have construed the Confrontation Clause to prohibit prosecutors from admitting "testimonial" out-of-court statements against a defendant unless the defendant has been afforded the opportunity to cross-examine the declarant. *See De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). A statement is testimonial "when the surrounding circumstances objectively indicate that the primary purpose" for the declarant making the statement was "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* (internal citations omitted).

"Generally, a co-conspirator's statements made in furtherance of the conspiracy are nontestimonial." *King v. State*, 189 S.W.3d 347, 359 (Tex. App.—Fort Worth 2006, no pet.) (citing several federal and Texas cases supporting proposition); *see also Crawford v. Washington*, 541 U.S. 36, 56 (2004) ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, . . . statements in furtherance of a conspiracy."). As we have already

concluded, the trial court could have reasonably determined that Demond's statements to Duggins and McNeil were made in furtherance of a conspiracy between Demond and Fuelberg to conceal theft, misapplication of fiduciary property, and money laundering. Therefore, we cannot conclude that the trial court abused its discretion in determining that Demond's out-of-court statements were non-testimonial, and thus Duggins's and McNeil's testimony did not violate the Confrontation Clause. *See id.* We overrule Fuelberg's fourth and sixth appellate issues.

**Restitution**

In his seventh and final issue on appeal, Fuelberg asserts that the trial court abused its discretion in ordering him to pay $126,000 in restitution. Specifically, Fuelberg asserts that because the jury only convicted him of third-degree felony theft, misapplication of fiduciary property, and money laundering, the jury implicitly found that Fuelberg at most stole, misapplied, or laundered $100,000. *See* Tex. Penal Code §§ 31.03(e)(5), 32.45(c)(5), 34.02(e)(2). Therefore, according to Fuelberg, the trial court abused its discretion in ordering restitution above the amount reflected in the jury's verdict.

We review a trial court's restitution order for an abuse of discretion. *Cartwright v. State*, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980). "The amount of the restitution must be just, and it must have a factual basis within the loss of the victim." *Campbell v. State*, 5 S.W.3d 693, 696 (Tex. Crim. App. 1999). In determining the appropriate amount of restitution, the court must consider (1) the amount of loss sustained by the victim and (2) other factors the court deems appropriate. Tex. Code Crim. Proc. art. 42.037(c). The victim's "loss must be a 'but for' result of the criminal offense and resulted 'proximately,' or foreseeably, from the criminal offense." *Hanna*

21

*v. State*, 426 S.W.3d 87, 95 (Tex. Crim. App. 2014). The State bears the burden of proving the amount of restitution, but unlike the guilt-innocence phase of trial, the amount of restitution need only be proven by a preponderance of the evidence. *See* Tex. Code Crim. Proc. art. 42.037(k).

Fuelberg concedes that there is a factual basis to support $86,000 for restitution—the amount of PEC funds used for Price's retainer.[8] The State asserts that in addition to this $86,000, there was reliable testimony that the PEC spent between $40,000 and $56,000 during the investigation for the Navigant Report to try to recover data that Fuelberg deleted from four of his laptops. *See Campbell*, 5 S.W.3d at 701 (noting that amount of restitution is not limited by property-value range reflected in indictment or conviction). In response, Fuelberg argues that the testimony about the PEC's investigation costs is insufficient to justify the restitution because (1) the witness estimated some of the work hours that went into recovering the lost data; (2) the data recovery process began before the investigators learned that PEC funds were being used to pay Price's retainer, and therefore could not have related to investigations of payments to Price; and (3) the witness could only provide some documentation to support his estimates, and some of that documentation was arguably inconsistent with his valuation.

Evidence of damages can come from many sources, including expert testimony, estimates from insurance adjusters, and lay testimony from a property owner about the value of

---

[8] Fuelberg asserts—and the trial court appears to have believed—that based on the record and the jury's verdict, the jury must have concluded that the PEC received fair value for Curtis's lobbying work, and thus the PEC's payments to Curtis cannot form the basis for the restitution order. We need not reach this issue because, as we will explain, there is a sufficient factual basis to affirm the trial court's restitution order regardless of whether it includes restitution for money paid to Curtis.

his property. *See Campbell v. State*, 426 S.W.3d 780, 783–84 (Tex. Crim. App. 2014) (explaining different methods of proving damages for restitution). The Navigant investigator's estimate of the cost of trying to recover the data that Fuelberg deleted was supported in part by copies of the Navigant's bills to the PEC and the investigator's own recollection of hours spent on the data recovery. Thus, the witness's testimony was supported both by his first-hand knowledge of the work done and documentation of the costs. Similarly, the fact that the bills did not separately delineate the cost of data recovery does not make the evidence insufficient because the witness was able to independently approximate the work done in the recovery effort. *See Elomary v. State*, 796 S.W.2d 191, 193–94 (Tex. Crim. App. 1990) (explaining why insurance adjuster estimate of damage is sufficient to support restitution order).

Finally, we find Fuelberg's argument that the PEC should not be entititled to restitution for costs that it incurred before it learned that PEC funds were being paid to Price unconvincing. The Navigant investigator testified that Navigant ultimately could recover little relevant data from Fuelberg's computers because it had been so thoroughly deleted. However, Navigant was able to recover subject lines from several emails indicating that the computers did contain emails from Fuelberg to Demond concerning the PEC's payments to Clark Thomas. Therefore, the trial court could have reasonably concluded that Fuelberg had intentionally deleted the information on the laptops to conceal incrementing information about his conspiracy to use PEC funds to pay Price's retainer. The fact that Fuelberg was extremely successful in deleting the data from his computer does not mean that the PEC's investigation expenses are not

23

compensable—rather, the investigation expenses are another injury that the PEC bore as a result of Fuelberg's complicated theft, misapplication, and money laundering offenses.

The record contains a factual basis for the trial court's determination that the PEC incurred at least $40,000 in investigation expenses for the data that Fuelberg deleted from his computers. Given that Fuelberg concedes that the record supports the remaining $86,000 in restitution, we conclude that the trial court did not abuse its discretion in ordering a total of $126,000 in restitution. We overrule Fuelberg's seventh and final issue on appeal.

## CONCLUSION

Having overruled Fuelberg's seven appellate issues, we affirm the trial court's judgment of conviction.

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed

Filed: July 16, 2014

Publish