## DEE CRAIG V. STATE

No. 33,250.   May 10, 1961
Motion for Rehearing overruled June 21, 1961

*Percy Foreman,* Houston, and *Luther E. Jones, Jr.,* Corpus Christi, for appellant.

*J. P. Hart,* La Grange (Special Prosecutor), *J. R. Owen,* County Attorney, Georgetown, and *Leon Douglas,* State's Attorney, Austin, for the state.

McDONALD, Judge.

Murder with malice is the offense, with punishment assessed at thirty years' confinement in the penitentiary.

At the January term, 1958, appellant was indicted by the Bastrop County grand jury for the offense of murder with malice aforethought upon the person of his wife, Grace Craig, on August 25, 1957. He was first tried in Bastrop County in May, 1958, but the trial resulted in a hung jury.

Upon a change of venue, the trial was transferred to Fayette County, where appellant was tried in April, 1959, and found guilty, with punishment assessed at fifty years in the penitentiary. This judgment was reversed (Craig v. State, 169 Tex. Cr. Rep. 23, 331 S.W. 2d 925).

The instant trial was had in Williamson County in October of 1960, upon a change of venue.

The facts, as adduced from the state's witnesses, reflect the following:

Appellant and the deceased were fishing in a boat on the Colorado River approximately two and a half miles south of Bastrop on the afternoon of August 25, 1957. They were the only occupants, and no witnesses were present at the site where Grace Craig met her death.

Appellant took the stand and testified at the first trial in Bastrop County that deceased was killed when a .410-gauge shotgun in the boat discharged accidentally. He did not testify either at the trial of the case in Fayette County nor at the trial in Williamson County.

The state's case was built entirely upon circumstantial evidence. The theory of the state and the proof adduced in support thereof was to the effect that appellant killed his wife to collect on insurance policies taken out on her life shortly prior to August 25, 1957. This evidence, together with proof of contradictory exculpatory statements made by appellant to several witnesses after his wife's death, and the physical evidence in the boat—particularly the location and descending angle of the fatal shot, was submitted to prove murder with malice aforethought.

In establishing motive, the state's testimony reflected that appellant had married the deceased in April, 1957, prior to purchasing a $500 life insurance policy on her life, to become effective on July 6, 1957, issued by the Rockdale Insurance Company, through Don Luckey, an officer of the company. Appellant was named beneficiary therein. On July 23, 1957, the deceased, in appellant's presence, signed an application for change of beneficiary from deceased's two adult children to the appellant, on a $1,200 accidental-death policy with Combined American Insurance Company, of Dallas, Texas, to become effective on July 31, 1957, the children referred to being by a former marriage. This policy, then, was in effect on August 25, 1957.

On July 23, 1957, Texas Central Life Insurance Company of Bryan, Texas, issued a $5,000 sportsman policy on the life of Grace Craig, and appellant was named beneficiary therein. This policy provided that upon proof of the insured's death due to

accident while fishing, hunting, or engaged in certain other sports, $5,000 would be paid the beneficiary.

The witness Luckey testified that, shortly after the death of Grace Craig, appellant went to Rockdale and talked with him, and that when he offered to pay the claim upon proof of death appellant indicated he was not ready and would return later to collect.

No claim was made under the Combined American Insurance policy until after the second trial in April of 1959 in Fayette County. Subsequent to that trial and prior to the third trial in Williamson County in October of 1960, claim was made through appellant's representative for benefits payable under the $5,000 policy issued by the Texas Central Life Insurance Company.

The state offered several contradictory statements made by appellant after the death of his wife, the state's contention being that such statements were incriminating and tended to show appellant's guilt, not only since they were contradictory in nature but in many respects were refuted by the physical evidence found in the boat as to the position and location of the deceased immediately prior to and subsequent to her death.

Following is a resume of the claimed contradictory statements:

The witness Schaefer, whose nickname was "Honey," testified as follows: He was at his fishing camp at the boat dock about two miles down the river from Bastrop when Dee Craig (appellant) came up in a fishing boat, around 5:30 or 6 o'clock on the afternoon of August 25, 1957. Billy Voight and Ben Simmons were with the witness at the time, cleaning some fish.

As appellant's boat came in closer, the witness heard him say: " 'Honey, please help me. Honey, help me.' " The witness pulled the boat into the dock, and saw Mrs. Craig (the deceased) lying there on the seat, "the same seat that the steering wheel was on." In relating the conversation between him and the appellant at that time, the witness said he asked appellant "what in the world happened" and appellant replied that "his wife had gotten shot down the river." When Schaefer asked where it happened, appellant told him, " 'Between here and Camp Ground Ford [a creek].' " When the witness again asked appellant what had happened, he replied that "his wife had caught one fish and

had taken it off the line, and she had a bite and stood up to jerk the pole, and when she did, she fell over backwards * * * and the gun must have went off and shot her."

The witness Billy Voight testified that "Honey" Schaefer asked appellant what had happened; that appellant said his wife "got shot"; that when Schaefer asked how it happened appellant said his wife "had caught a fish and he taken it off and rebaited her hook and threw her line out, and * * * she fell over backwards, and the gun went off"; that this occurred "down at the mouth of Little Creek between Honey Schaefer's place and Camp Ground Ford."

I. R. Hoskins, Bastrop County Sheriff, testified that he had a conversation with appellant about 6:30 o'clock on the evening of August 25, 1957, as he (appellant) sat with C. A. Long in the latter's car, in front of a Bastrop hospital; that when he (the sheriff) asked appellant what had occurred appellant replied: " 'I don't know.' " The sheriff further testified that he then asked appellant: " 'Dee, what happened? Did somebody shoot her?' "; that appellant's reply was: " 'I don't know what happened. I didn't even hear a shot.' " Testifying further, the witness said that appellant, accompanied by his (appellant's) son and a brother of the deceased, came to his office a day or two after the funeral; that Dudley White, a Texas Ranger, was in the office at the time; that in the ensuing conversation appellant asked him if he had "found out anything or knew anything more about it"; that he told appellant he was continuing the investigation; that when he questioned appellant further as to whether he knew any more about the matter appellant related "that he was changing water on a little fish in the back of the boat that Mrs. Craig had caught, and he heard a shot, and he looked around, and she was lying in the boat, bleeding."

Mrs. Laurine Beale, a niece of the deceased, testified that she had a conversation with appellant about 9:30 o'clock on the night of August 25, 1957, in the living room of her aunt's home, in which conversation appellant told her that he and his wife had gone to the river to fish, that his wife was seated in the front of the boat with her back to him and he was in the back of the boat when the deceased caught a catfish (the witness demonstrated the length of the fish), that she turned around and said: " 'This is the biggest fish I have ever caught in my life * * * It has got a mate out there, and I am not going home till I get it,' " and that appellant replied: " 'Okay; if you want to stay

longer, we will.' " The witness then testified that appellant said to her (the witness) : " 'God, that is when the fatal shot come,' " in those precise words.

Parker Beale, the above witness' husband, testified to virtually the same facts as his wife had related.

Dudley White, a ranger with the Department of Public Safety for eighteen years, testified that he had talked with appellant in the sheriff's office in Bastrop on August 30, 1957; that appellant told him "that they were fishing, and he was fishing out of the back and she was fishing out of the front, and it was something mentioned about her catching a fish, and they had it in a wastepaper * * * basket; and he was changing the water in the fish that they had in there, and he heard a noise, and turned around, and she was laying in the boat bleeding."

The state also read a part of appellant's testimony from the first trial in Bastrop County, at which appellant had related that he was sixty years old, had lived in Elgin for the last fifteen or twenty years with the exception of the four months he lived in Bastrop, had married the deceased on April 12, 1957; that on the day in question he and his wife had gone to deceased's favorite fishing spot. The following is quoted from appellant's further testimony at the trial:

"There's a high bank on the west side that provided shade for us, a willow that run out over the river, I'd say extended out thirty feet or more from the bank of the river * * * she sat where she could lean back with her back against the steering wheel and fish over this way * * * I was sitting * * * on the back seat where there was a fish that she'd just caught and I had taken off her line. I'd put the worms—the fish bait * * * on the hook for her, and she was doing the fishing at that time * * * I'd shot a turtle out there just a few minutes before she'd caught this fish, and the time she caught the fish I was reloading the gun again. I loaded it— throwed the empty shell out, and reloaded the gun again * * * I threw the hull out and the shell went in the magazine; the gun was reloaded." (Appellant at that point had explained that he meant the "barrel" instead of the "magazine.")

We quote further from that testimony:

["Q How many shells did this gun—] A Three.

["Q Three? Do you know whether or not it was fully loaded?] A Fully loaded; I carried it fully loaded all the time * * *.

["Q Now, then, do you remember what you did with the gun?] A I laid it back on the seat over there on the left-hand side of the boat."

Appellant further related at the first trial that his wife said to him: "Dee, yonder's a turtle—Honey, I'm going to shoot him"; that he replied: "O.K., be careful." He testified that "she had reached over, [when he looked around] and got this gun by the end of the barrel—standing up. * * * She reached and got the gun like this and come up the same time with the gun. * * * Now, she, with the gun—holding it like this, when I looked I said, 'Honey, be careful'—she fell backwards, gun and all, and the gun went off—I don't know—and she was slumped back over this way, when I got to her and grabbed her."

The above testimony from the first trial was read, here, by stipulation of counsel for both appellant and the state.

Fred R. Rymer, supervisor of the firearms section of the Department of Public Safety and employed there for twenty years, testified that he had the training and experience to qualify him as a ballistics expert, with a degree from the University of Texas; that he had attended in-service school, had studied at the H. P. White Ballistic Laboratory, had spent some time in the Frankfurt Arsenal; that he had worked on a great many cases during that time; that in connection with ballistics examination the department would have as many as two hundred fifty or three hundred a year. The witness testified that on the evening of August 25, 1957, he contacted Sheriff Hoskins in the sheriff's office and saw the .410-gauge shotgun there; that he was present during the autopsy by Dr. Thomas on the body of Mrs. Grace Craig in Smithville, Texas, at the Marrs Funeral Home, about one o'clock in the morning; that he observed the removal of the upper portion of the skull and the removal of some metallic objects from the tissue of the brain; that these were shot pellets, which the doctor washed off and handed to him; that it was his opinion that they were No. 6 shot. He further testified that Sheriff Hoskins had delivered him nine No. 6 cartridges, the same size as the shot removed from deceased's brain; that he observed a wound between an inch and an inch and a half behind her right ear and a power burn forward of the wound about a

half to three-quarters inch outside the wound; that he took the .410-gauge shotgun back to Austin and used it to fire tests into targets to attempt to reproduce a pattern similar to that which he had observed on the wound, using the same size shot as the cartridges submitted to him. He also testified that he examined the shotgun and found what appeared to be blood or tissue up near the muzzle; that as a result of the test patterns fired by him and his observation of the power burn around the wound, it was his opinion, as to the relationship between the gun and the head of the deceased, that the muzzle of the gun was in slight contact with and at an approximate 45-degree angle from the head. The witness was instructed to state the relationship between the size of the hole in deceased's head "as compared to the size of the test pattern fired." As to this, he testified: "I found the size of the wound to be approximately the same as the diameter of the holes there in the test pattern."

The witness Thomas, a general practitioner, physician, and surgeon in Smithville, Texas, testified that he received a degree from Baylor University; that his training included the study of the human body and an internship in Brackenridge; that he had practiced continuously since 1952. He testified that about 3 o'clock on the morning of August 26, 1957, he examined the body of a white female, approximately fifty-three years of age, by the name of Grace Kelley Craig; that he did an autopsy "on the anatomy of the head" and his examination revealed "a rather severe disfiguring swelling about the face and the scalp." His testimony continued as follows:

"There were gross fracture lines felt throughout the skull that could be felt through the scalp. There was a considerable amount of bleeding from both the ears and nose and mouth; there was a small hole located posterior to the right ear about an inch behind the auricle of the ear, which is the soft part of the ear; and also this hole was located just above a line drawn horizontally through the midline of the ear."

The witness stated that in his opinion "the cause of death would be gunshot wound of the head." He was then asked: "What is your opinion as to the angle at which the shot was fired, in regard to the midline of the back of the head?" He replied: "The point from which the hole appeared on the right side of the skull, following the line of greatest destruction and including the greatest concentration of shot located in the left cheek, the angle from the back would be about 45 degrees from a vertical plane from the back."

The state also introduced into evidence, as exhibits, four color photographs taken of the boat as to seat cushions, steering wheel, motor, equipment, and controls, and the boat's contents, including the .410-gauge shotgun, an empty box of shotgun shells, blood on the cushions and on the floor of the boat, an oar, a rod and reel, a minnow bucket, hat, and a Coca Cola box.

Appellant placed no witnesses on the stand nor did he adduce any testimony.

No formal bills of exception were filed.

Appellant contends, by an informal bill of exception, that the trial court erred in admitting the opinion-testimony of ballistics-expert Rymer as to his opinion concerning the relationship between the shotgun which killed the deceased and the head of deceased at the time the fatal shot was fired, it being Rymer's testimony—as hereinabove shown— that when the gun fired, its position was such that the muzzle was in contact with deceased's head at an approximate 45-degree angle from the head.

Next, by informal bill of exception, appellant complains of the action of the trial court in admitting testimony of state's witness Dr. Thomas, regarding his opinion as to the angle at which the fatal shot was fired with regard to the midline of the back of deceased's head.

We shall consider these two points together:

It is appellant's position that the admission of this testimony invades the province of the jury, calls for an opinion within a field that is as valid in the appraisal of ordinary laymen as in the expert's knowledge, and that the expert is testifying out of a field in which he undertakes to qualify as an expert.

The opinion expressed by the witness Thomas was based upon facts established by the autopsy made by him and his professional observations of the deceased from scientific knowledge or learning within his field.

The witness Rymer, the firearms and ballistics expert, was present and observed the autopsy performed, also testifying, as shown, that he closely observed the wound in the back of deceased's head, that he examined the shotgun and found what

appeared to be blood and tissue up near the muzzle of the gun. The witness also testified that he fired test patterns with similar shotgun shells to establish the angle of the shot and the distance of the shotgun from the head of deceased; that, based on his observations and the test patterns fired and his scientific knowledge in his particular field, it was his opinion that the muzzle of the gun was in slight contact with deceased's head at an approximate 45-degree angle from the head.

Whether the witness, offered as an expert, possesses the required qualifications is a preliminary question to be determined by the trial court. McCormick and Ray, Texas Law of Evidence, Sec. 1401, and cases there cited. The expert witness may offer his opinion as to the kind of instrument with which the wound was made, and give his opinion as to the place of entry and exit and range of the bullet, in cases of gunshot wounds. McCormick and Ray, supra, Sec. 1427, citing Huey v. State, 142 Tex. Cr. Rep. 522, 155 S.W. 2d 61 (Syl. 3).

While it is true that the expert witness may not state his conclusions as to the position of either the victim or the assailant at the time the shot was fired, we find nothing in this record in contravention of this premise.

We do not agree with appellant's contention that the trial court erred in admitting the testimony of these expert witnesses, and we find the evidence sufficient to sustain the trial court's action in determining that the expert witnesses were fully qualified to give the testimony as adduced from them.

Appellant cites Langford v. State, 124 Tex. Cr. Rep. 473, 63 S.W. 2d 1027, and Boles v. State, 108 Tex. Cr. Rep. 204, 299 S.W. 407, in support of his contentions.

Both of these cases were distinguished by this court in its opinion in the case of Cordero v. State, 164 Tex. Cr. Rep. 160, 297 S.W. 2d 174.

We do not feel that Langford and Boles are applicable to this case but we do think that Cordero controls and finally puts to rest the objection that the answer of the expert witness "usurps the function" or "invades the province" of the jury.

Appellant next complains of the action of the trial court in admitting the four color photographs into the evidence, it being

his contention that the photographs exhibited a gory scene created by blood and brain matter from the deceased's wound and that such photographs were highly inflammatory and prejudicial.

We feel that the photographs did shed light on the transaction and tended to refute appellant's testimony and his version as to how the fatal injury took place; that the photographs shed further light to prove the state's theory of the case as to what actually happened to the deceased, in that said photographs were offered as conclusive proof that the deceased could not possibly have fallen backward between the middle and front seats of the boat, with her head above or resting on the tackle box. Viewing the testimony of the various witnesses and that of appellant, the photographs served to solve some disputed fact issues, indicating by the presence of blood the location of deceased's head in the boat.

We find no merit in appellant's contention, and we feel that the action of the trial court was correct and is supported by the enunciations of this court in Alcorta v. State, 294 S.W. 2d 112; Ray v. State, 160 Tex. Cr. Rep. 12, 266 S.W. 2d 124; Gibson v. State, 153 Tex. Cr. Rep. 582, 223 S.W. 2d 625; Cordero v. State, supra; Branch's P.C., 2d Ed., Vol. 4, Sec. 2251.

Appellant's fourth and last contention is that the special prosecutor, in jury argument, made prejudicial allusions to the failure of appellant to testify.

We have carefully reviewed the record of the complained of argument and we do not feel that it violated Art. 710, V.A.C.C.P. We do not construe the argument to be either a comment on appellant's failure to testify or an allusion to his failure to take the stand.

As shown from the record, appellant made several contradictory statements prior to the first trial in Bastrop County as to what actually happened on the date his wife was fatally injured. Appellant took the stand at the first trial and testified voluntarily as to what, in fact, did transpire on the occasion —which testimony contradicted each and every prior statement made by appellant as to what did actually happen.

In his argument, the special prosecutor referred, a number of times, to these contradictory statements and, in effect, asked

for an explanation of them in the sense that the jury, in arriving at the verdict, was entitled to have an explanation.

We find that such argument was based wholly upon testimony in evidence and that it was not comment upon the fact that he did not take the stand, nor was it an allusion to such fact. It was simply a demand for an explanation as to why appellant could give no information to the officers shortly after the incident but could testify, in detail, some eight or nine months later at his trial in Bastrop County.

Appellant's contention is without merit. See Lewis v. State, 98 Tex. Cr. Rep. 337, 265 S.W. 709; Gordy v. State, 160 Tex. Cr. Rep. 201, 268 S.W. 2d 126; Lowry v. State, 138 Tex. Cr. Rep. 606, 137 S.W. 2d 785; Hart v. State, 163 Tex. Cr. Rep. 472, 293 S.W. 2d 659.

We find the evidence sufficient to support the jury's verdict.

The judgment is affirmed.