SEE AMEND BRF FILED
ON 9/10/15

ACCEPTED
03-15-00328-cr
6619835
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/24/2015 12:15:52 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00328-CR

### IN THE COURT OF APPEALS FOR THE THIRD COURT OF APPEALS DISTRICT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/24/2015 12:15:52 PM
JEFFREY D. KYLE
Clerk

## DANIEL LORENZO WILSON,

### Appellant

### v.

## THE STATE OF TEXAS,

### Appellee

## APPELLANT'S BRIEF

On Appeal from the 264th District Court
of Bell County, Texas,
Trial Court Cause No. 72,334

**E. Alan Bennett**
State Bar #02140700
Counsel for Appellant

Sheehy, Lovelace & Mayfield, P.C.
510 N. Valley Mills Dr., Ste. 500
Waco, Texas 76710
Telephone: (254) 772-8022
Telecopier: (254) 772-9297
Email: abennett@slmpc.com

# Identity of Parties and Counsel

Appellant, pursuant to Rule of Appellate Procedure 38.1(a), provides the following list of all parties to the trial court's judgment and the names and addresses of all trial and appellate counsel.

Daniel Lorenzo Wilson                                                        Appellant

Steven Streigler                                  Trial Counsel for Appellant
P.O. Box 1683
Belton, TX 76513

E. Alan Bennett                         Appellate Counsel for Appellant
510 North Valley Mills Dr., Ste. 500
Waco, Texas 76710

Michael Waldman                           Trial Counsel for the State
Assistant District Attorney

Bob D. Odom                            Appellate Counsel for the State
Assistant District Attorney

Bell County District Attorney's Office
P.O. Box 540
Belton, Texas 76513

# Table of Contents

Identity of Parties and Counsel...................................................................2

Table of Contents ....................................................................................3

Index of Authorities.................................................................................4

Statement of the Case .............................................................................6

Statement Regarding Oral Argument.......................................................6

Issues Presented .....................................................................................6

Statement of Facts ..................................................................................7

Summary of the Argument......................................................................18

Argument ...............................................................................................19

  First Issue: The trial court abused its discretion by admitting photographs from the crime scene that were unfairly prejudicial.............19

    A. This Court Reviews Evidentiary Rulings for an Abuse of Discretion ..................................................................................................19

    B. Unfairly Prejudicial Evidence May Be Inadmissible...........................20

    C. The State Offered Unnecessary & Unfairly Prejudicial Photographs ..................................................................................................21

    D. Under *Erazo*, the Photographs Should Not Have Been Admitted ....23

    E. The Error Affected Wilson's Substantial Rights .................................29

Prayer.....................................................................................................33

Certificate of Compliance .......................................................................34

Certificate of Service ..............................................................................34

# Index of Authorities

## Texas Cases

*Aviles v. State*, No. 05-07-00477-CR, 2008 WL 1850779 (Tex. App.—Dallas Apr. 28, 2008, pet. ref'd) (mem. op., not designated for publication) .... 28, 29

*Brown v. State*, 875 S.W.2d 38 (Tex. App.—Austin 1994, no pet.) ..................23

*Burnett v. State*, 88 S.W.3d 633 (Tex. Crim. App. 2002)............................ 30, 31

*Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999)..........................28

*Craig v. State*, 347 S.W.2d 255 (Tex. Crim. App. 1961) .............................. 27, 28

*Davis v. State*, No. 03-07-00305-CR, 2008 WL 3877696 (Tex. App.—Austin Aug. 20, 2008, pet. ref'd) (mem. op., not designated for publication) ..........21

*Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004) .................. 21, 24, 26, 27

*Fuelberg v. State*, 447 S.W.3d 304 (Tex. App.—Austin 2014, pet. ref'd) .........20

*Gallo v. State*, 239 S.W.3d 757 (Tex. Crim. App. 2007)......................... 19, 20, 21

*Haley v. State*, 173 S.W.3d 510 (Tex. Crim. App. 2005)....................................30

*Miller-El v. State*, 782 S.W.2d 892 (Tex. Crim. App. 1990) ........................ 23, 26

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991) (op. on reh'g) ............................................................................................................... 21, 26

*Narvaiz v. State*, 840 S.W.2d 415 (Tex. Crim. App. 1992) ................................21

*Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000)...................... 24, 26, 27, 29

*Sandoval v. State*, 409 S.W.3d 259 (Tex. App.—Austin 2013, no pet.) ..... 29, 30

*Shuffield v. State*, 189 S.W.3d 782 (Tex. Crim. App. 2006)................................20

*State v. Davis*, 349 S.W.3d 535 (Tex. Crim. App. 2011)....................................32

*Terrazas v. State*, No. 03-05-00344-CR, 2006 WL 2080381 (Tex. App.—Austin July 28, 2006, pet. ref'd) (mem. op., not designated for publication)............21

*Threadgill v. State*, 146 S.W.3d 654 (Tex. Crim. App. 2004).............................20

## Texas Statutes

TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1).......................................................23

TEX. CODE CRIM. PROC. art. 44.29(b) ................................................................32

TEX. PEN. CODE § 19.02(b)(1) ...........................................................................6

## Rules

TEX. R. APP. P. 43.2(d) .......................................................................................32

TEX. R. APP. P. 44.2.................................................................................... 29, 30

TEX. R. EVID. 403 ...............................................................................................20

## Statement of the Case

Daniel Lorenzo Wilson pleaded guilty to murder without the benefit of a plea bargain. (CR 15-22), (2 RR 7). *See* TEX. PEN. CODE § 19.02(b)(1). The Honorable Martha J. Trudo, presiding judge of the 264th District Court of Bell County, assessed his punishment at life imprisonment. (CR 25-26), (3 RR 175). Wilson timely filed his notice of appeal. (CR 29).

## Statement Regarding Oral Argument

Oral argument will not aid the Court's decisional process in this appeal.

## Issues Presented

First Issue:     The trial court abused its discretion by admitting photographs from the crime scene that were unfairly prejudicial.

## Statement of Facts

The indictment alleges that on or about December 9, 2013, Wilson "did then and there intentionally and knowingly cause the death of an individual, namely, Karen Edwards, by shooting her with a firearm and stabbing and cutting the said Karen Edwards with a knife." (CR 4).

Wilson pleaded "guilty" to the murder charge.[1]  (2 RR 7). The trial court rescheduled the case for a sentencing hearing. (2 RR 9).

Janet Allman works for the Bell County Communications Center which handles 9-1-1 calls and dispatches emergency responders. (3 RR 7-8). The call center received a 9-1-1 call on the morning of December 9, 2013 at about 5:21. (3 RR 9) Allman identified a recording of that call which was admitted as State's Exhibit 1. (3 RR 10) The caller reported that she had been held hostage and had seen her friend murdered. The shooter shot her in the leg, stomach and head. He held a gun to the caller's head as well. The caller stated that he was drunk and passed out. She took the gun from

---

[1]	Wilson also pleaded "true" to allegations in a motion to adjudicate his deferred adjudication community supervision for possession of less than 1 gram of cocaine, a state jail felony. (2 RR 4-7). The trial court adjudicated his guilt and sentenced him to 2 years' confinement in a state jail. (3 RR 174). Wilson did not appeal from this judgment.

him and ran away. She gave the address for his apartment. She urged the operator to tell the officers to turn off their sirens that she heard approaching because she feared they would awaken the shooter. She identified the shooter as Daniel Wilson. Officers arrived as she talked to the operator. (SX 1)

Latasha Brown is the person who called 9-1-1. She recently relocated to Dallas County so she could "get myself together mentally." (3 RR 12). She moved to Killeen near the end of 2012 after being paroled on her sentence for burglary of a habitation. (3 RR 12-13). She had a few jobs including a part-time job at a tire shop where she worked with Wilson. (3 RR 13-14). She identified Wilson and Karen Edwards as being part of the group of friends that she routinely spent time with at that time. (3 RR 14). She identified Wilson as "a local drug dealer" and "a very cool person to hang out with." "He was a very giving individual." They barbecued, watched movies and went out. She spent more time with Wilson than anyone else. (3 RR 15). Brown had a cocaine habit in 2013 and used daily. Wilson was one of her main suppliers. (3 RR 16).

Brown met Karen Edwards through Brown's girlfriend Cynthia Anderson. (3 RR 12, 16-17). Edwards had been friends with Anderson's

mother who passed away in 2012. Anderson referred to Edwards as Aunt Karen or Momma Karen or some similar term of endearment. Their families had known each other for a long time. (3 RR 16-17). Edwards lived two doors down from Wilson in the same apartment complex. Brown understood that "they had dated years before." (3 RR 18). As far as Brown could see, Edwards and Wilson saw each other on a regular basis and "got along great." Edwards "smoked crack cocaine" and prostituted herself or hustled money to support herself. Wilson "always helped her" when she needed money or anything. "Always." He helped her with her rent several times. (3 RR 19).

Brown went to check on Wilson about every other day in late 2013 because he had been injured when a car struck him while riding a bicycle. (3 RR 17). In December 2013, Brown and Anderson had several arguments. Brown stayed at Wilson's house nearly the entire weekend of December 11. "We watched movies, drank beers, smoked cigarettes, ordered pizza. I was just hanging out. He was my escape from arguing and fighting and stuff like that." Wilson lived less than a half mile from Brown and Anderson. (3 RR 20). That Friday night, Brown testified that she was using drugs (cocaine) but Wilson was not. She got the cocaine from him though. (3 RR

21). She walked home around midnight and awoke around noon on Saturday. Issues still remained with Anderson so she went back to Wilson's house that afternoon and they did the same things they had done the night before. (3 RR 22). She went home Saturday night and returned Sunday afternoon around 2:00 or 3:00. They played video games; she went to the store (with Wilson's money) for beer and cigarettes; and Wilson ordered pizza. (3 RR 23).

Karen Edwards came over to Wilson's house around 11:30 that Sunday night.[2] Brown was about to leave to go home. Wilson was in the bathroom. Edwards came inside and sat on the couch. (3 RR 24). Wilson came into the living room, and Brown headed to the bathroom. Wilson sat down next to Edwards, and they started talking. (3 RR 25). As Brown was closing the bathroom door, she heard a gunshot. (3 RR 25-26). She knew that Wilson had a gun because she had seen him cleaning it before. He kept it in a drop-down compartment in his sectional sofa. (3 RR 26). Brown never heard Wilson raise his voice. When Edwards had asked him for a cigarette, he told her that he did not have any. Then she asked for money to

---

[2]     Wilson kept the key to Edwards's apartment so she would not lose it. She typically came by at night to let him know she was home and get her key. (3 RR 24).

buy a pack. She thought Wilson was joking around with Edwards. Then, she heard the shot, and Karen started screaming. "And the person that I saw was not Mr. Wilson. It couldn't have been." "I never seen him like that." (3 RR 27). She explained that his eyes turned red and he had "a blank stare almost like it wasn't him." (3 RR 29). "[H]e was infuriated." (3 RR 30).

Brown walked back to the living room and saw Wilson sitting on the sofa holding his gun. Edwards was holding her leg where it appeared to Brown that she had been shot. (3 RR 28). Edwards asked Wilson to just let her go, and she promised not to tell anyone what he had done. Brown joined in and asked him to let her take Edwards home. (3 RR 30). Wilson told them, "I know you won't say anything because you're not leaving." Then he started "rambling and mumbling under his breath." (3 RR 31). He went and got a towel or rag and they tried to tie it around Edwards's leg to stop the bleeding. (3 RR 31-32).

> And she just really kept screaming, just screaming like yelling, "Daniel, you shot me, you shot me. Daniel, you shot me. Oh my god, I can't believe you shot me." And he's, "you shut up," you know, be whatever, you know, be quiet, "I can't think. Just shut up," you know, telling her to shut up. She continues screaming and once she kind of calms down a little bit, and he's standing there just like, you know, "I love you," right? You know, he got calm. And I didn't understand that.

(3 RR 32).

After Wilson "got calm," he shot Edwards in the stomach. This was about thirty minutes after he shot her in the leg. (3 RR 32). Wilson was standing over Edwards as she sat on the sofa when he shot her the second time. He also unleashed a string of obscenities and told Edwards, "[Y]ou're going to learn to stop playing with me." (3 RR 33). At that time, Edwards "begged for her life, she wanted to call her kids, she wanted to talk to her momma one last time." Brown "ran and got in the shower [and] nervously smoked a cigarette." Then she heard a thump and Edwards screaming something to the effect "it's leaving out of me, my life is leaving." (3 RR 34). Brown was scared and did not know what to do. Then she saw Edwards sliding backward across the floor to the bathroom door. (3 RR 35). Brown tried to get her attention so they could jump out of a window and escape. (3 RR 35-36).

> And she's like, no, he's going to kill me if I try that. And I knew she couldn't walk, she had been shot in her leg. So I'm just like slide in here and we'll lock the door and I'll put you out the window. We'll go out the window and we'll make it out here and she's like no. She's crying. And it's a bit chaotic.

Wilson was still standing in the living room holding the gun. (3 RR 36). "He started waving it," and Edwards screamed every time he raised

the gun. Brown thought he was taunting her. Wilson was saying, "I should kill you right now." Edwards begged him to let her call her children and say goodbye before he killed her. Brown stepped out of the shower and tried to pick Edwards up, but she was too heavy. (3 RR 37-38). "Wilson got a little upset." He picked Edwards up and tossed her aside like a sack of potatoes. (3 RR 38). "He told her to pray to her maker, and he shot her in the head, and she was still breathing. So he took a flashlight and smashed her face." More than an hour passed between the time when he shot her in the stomach and when he shot her in the head. (3 RR 39). Apparently, Wilson struck her repeatedly with the flashlight because she was still breathing. (3 RR 39-40). Brown saw "chunks of brain matter, skin flying everywhere." (3 RR 41-42). Then, because it appeared she was still breathing, Wilson threw her down and stepped on her neck. "[H]e grabbed a sword off of the table and just started chopping downwards." (3 RR 42).

Wilson opened the door and told Brown that she would help him dispose of the body or she would be next. He pointed his gun at her and pulled the trigger, but there were no bullets left in it. (3 RR 43). They moved the body to the front porch. (3 RR 44-45). They tried to carry it across the street but Brown kept dropping it because it was so heavy. Then

they grabbed Edwards's legs and dragged her body behind a vacant house. (3 RR 45-46)

Wilson ordered Brown back in his house. He told her to help him clean up the mess. He took off his clothes and told her to put them in a plastic bag. Brown asked to borrow a phone so she could get a ride to a store for some bleach to clean up. (3 RR 46). After that, they drank beers and smoked cigarettes. He gave her $5.00 for bleach and let her call a friend. She grabbed his gun and left. She testified that she "was high out of my mind that night." (3 RR 47). She met her friend and went to another friend's house. They smoked cigarettes, drank alcoholic beverages, smoked marijuana and used cocaine. (3 RR 48). Then, Brown changed clothes and put the clothes she had been wearing in a plastic bag because they still had "brain matter and blood" on them. (3 RR 48-49). She drank some more before a friend convinced her to call the police, which she did. (3 RR 49).

Over objection, the State offered eighteen photographs in evidence from the crime scene. (3 RR 50-62). Brown concluded that this was totally out of character for Wilson and she had never him act anything like that before. (3 RR 63-64). She still has no idea why he got so upset that night. (3 RR 68). He was "inebriated . . . but not drunk." (3 RR 71).

Doctor Emily Ogden is a medical examiner with the Southwestern Institute of Forensic Sciences in Dallas. (3 RR 82), (SX 2). She performed the Edwards autopsy. (3 RR 84). The autopsy revealed a series of injuries consistent with those described by Brown. (3 RR 85-92), (SX 2). Toxicology results indicated the presence of ethanol, cocaine and marijuana in her system. (3 RR 92-93), (SX 2).

Killeen Police Detective Rodney Wilmore responded to Wilson's apartment as the crisis negotiator with the tactical response unit. (3 RR 99). Wilson ultimately surrendered to the authorities without incident. (3 RR 101) Wilmore served as the lead investigator for the case. He described the crime scene and additional photographs and diagrams were admitted through him without objection. He agreed that Wilson cooperated with the responding officers. (3 RR 116).

Psychologist Dr. Stephen Thorpe testified for the defense. He performed a clinical interview of Wilson and conducted a battery of psychological tests. (3 RR 121-22). He opined that Wilson has an IQ of 76 which places him in the "borderline range of intelligence." On the achievement test, Wilson demonstrated a fifth or sixth grade level of reading and math which placed him somewhere in the range of an 11- to

13-year-old. (3 RR 122). Dr. Thorpe determined that Wilson suffered from "some type of psychosis schizophrenia" characterized by "very bizarre hallucinations, delusional beliefs, paranoid ideation." His history also indicated that he had experienced depression, anxiety and substance abuse issues. (3 RR 125). Dr. Thorpe was struck by the fact that Wilson had not been previously diagnosed or treated for his schizophrenia until he was arrested in this case. (3 RR 126). The treatment regimen has resulted in significant improvement for Wilson. (3 RR 126-27).

On cross-examination, Dr. Thorpe agreed that prior evaluations and reports had not detected any psychological or mental health issues for Wilson. (3 RR 139-40). He testified that long-term cocaine use "can have a significant impact organically on the brain." Prolonged alcohol abuse can likewise have an adverse effect. (3 RR 140). Those effects could present themselves in a manner very similar to schizophrenia. (3 RR 140-41).

In closing arguments, the defense asked the trial court to take Wilson's diagnosis and substance-abuse problems into account and assess a lesser punishment. (3 RR 165-69). The State asked for a life sentence. (3 RR 173-74).

The trial court assessed Wilson's punishment at life imprisonment. (CR 25-26), (3 RR 175).

## Summary of the Argument

Latasha Brown testified in graphic detail regarding the manner in which Wilson carried out this offense. Nevertheless, the State also offered seven graphic photographs through Brown that depicted Edwards's injuries or the implements Wilson used to inflict them. A few of these focused on the bloodied results of Wilson's conduct including "blood and skin and brain matter." Because Wilson pleaded guilty and because Brown described the events leading to Edwards's death in graphic detail, the admission of these photographs was unnecessary, and the probative value of these photographs was substantially outweighed by the danger of unfair prejudice. Thus, the court abused its discretion by admitting these photographs.

# Argument

**First Issue:**   **The trial court abused its discretion by admitting photographs from the crime scene that were unfairly prejudicial.**

Latasha Brown testified in graphic detail regarding the manner in which Wilson carried out this offense. Nevertheless, the State also offered seven graphic photographs through Brown that depicted Edwards's injuries or the implements Wilson used to inflict them. A few of these focused on the bloodied results of Wilson's conduct including "blood and skin and brain matter." Because Wilson pleaded guilty and because Brown described the events leading to Edwards's death in graphic detail, the admission of these photographs was unnecessary, and the probative value of these photographs was substantially outweighed by the danger of unfair prejudice. Thus, the court abused its discretion by admitting these photographs.

## A. This Court Reviews Evidentiary Rulings for an Abuse of Discretion

Rulings on the admissibility of evidence are reviewed under an abuse-of-discretion standard. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim.

App. 2007); *Fuelberg v. State*, 447 S.W.3d 304, 315 (Tex. App.—Austin 2014, pet. ref'd).

A photograph is generally relevant and admissible if verbal testimony regarding what is depicted in the photograph is also admissible. *See Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004).

**B. Unfairly Prejudicial Evidence May Be Inadmissible**

Under Rule of Evidence 403 however, relevant evidence is inadmissible if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Rule 403 favors the admissibility of relevant evidence, and it is presumed that relevant evidence is more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

> [A] proper Rule 403 analysis by either the trial court or a reviewing court includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; (4) the proponent's need for the evidence. In the context of the admission of photographs, we also consider the factors set out in *Narvaiz*. Those factors include the number of photographs, the size,

whether they are in color or are black and white, whether they are gruesome, whether any bodies are clothed or naked, and whether the body has been altered by autopsy.

*Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004) (citing *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992); *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1991) (op. on reh'g)) (footnotes omitted); *see Davis v. State*, No. 03-07-00305-CR, 2008 WL 3877696, at *5 (Tex. App.—Austin Aug. 20, 2008, pet. ref'd) (mem. op., not designated for publication); *Terrazas v. State*, No. 03-05-00344-CR, 2006 WL 2080381, at *6 (Tex. App.—Austin July 28, 2006, pet. ref'd) (mem. op., not designated for publication). "The availability of other means of proof and the circumstances unique to each individual case must also be considered." *Gallo*, 239 S.W.3d at 762.

## C. The State Offered Unnecessary & Unfairly Prejudicial Photographs

Wilson objected to eighteen photographs that were admitted through Brown as sponsoring witness. This issue focuses on seven of these photographs.

Wilson objected to the admission of the following photographs:

1. State's Exhibit 3          aerial view of neighborhood

2.  State's Exhibit 7          Edwards's body in backyard

3.  State's Exhibit 8          closer view of body

4.  State's Exhibit 9          close-up of Edwards's face and chest

5.  State's Exhibit 10         house and yard where body left and pathway from Wilson's apartment

6.  State's Exhibit 11         Wilson's apartment building

7.  State's Exhibit 13         bloodstains where Brown dropped the body

8.  State's Exhibit 14         pool of blood on sidewalk

9.  State's Exhibit 16         walkway to apartment

10. State's Exhibit 20         Wilson's and Edwards's apartment doors

11. State's Exhibit 21         view from Wilson's door to house where body left

12. State's Exhibit 22         close up of view in State's Exhibit 21

13. State's Exhibit 23         sectional sofa in Wilson's apartment

14. State's Exhibit 24         Wilson's living room and entryway

15. State's Exhibit 25         sword "used to chop up" Edwards's body (3 RR 61)

16. State's Exhibit 31         flat-screen television with "blood and skin and brain matter" on it (3 RR 61)

17. State's Exhibit 34         flashlight "used to smash Miss Edwards' face in" (3 RR 61-62)

18. State's Exhibit 35        close-up view of bloody flashlight

Wilson's appellate complaint challenges the admission of State's Exhibits 4, 7, 8 and 15-18.

## D. Under *Erazo*, the Photographs Should Not Have Been Admitted

### *Probative Value*

The challenged photographs do have probative value with regard to the extent of the injuries suffered by Edwards and the culpable mental state with which Wilson acted. However, because Wilson pleaded guilty, neither of these was contested.

Evidence of the "circumstances of the offense" is admissible during the punishment phase. TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1). The circumstances of the offense include the extent of a victim's injuries "so long as a factfinder may rationally attribute moral culpability to the accused for that injury." *Miller-El v. State*, 782 S.W.2d 892, 896 (Tex. Crim. App. 1990); *Brown v. State*, 875 S.W.2d 38, 40 (Tex. App.—Austin 1994, no pet.).

*Ability to Impress Factfinder in Irrational Manner*

The nature of the photographs themselves is relevant to this issue. *See Erazo*, 144 S.W.3d at 494-95; *Reese v. State*, 33 S.W.3d 238, 242 (Tex. Crim. App. 2000).[3] The challenged photographs are color photographs whose actual size is unclear from the record on file. Actually, however, they were much larger in the eyes of the trial court because they were projected on a screen.[4] (3 RR 53).

State's Exhibit 9 is a close-up of Edwards's face and chest depicting dirt or some other substance on her face. This exhibit was completely unnecessary as her identity was not at issue and other photographs were admitted depicting the location and condition of her body.

State's Exhibits 13 and 14 depict blood pooled on the sidewalk. These bloody photographs were completely unnecessary as Brown testified

---

[3] The photographs held unfairly prejudicial in *Erazo* and *Reese* were admitted during the punishment phase as were the photographs at issue in this appeal. *See Erazo v. State*, 144 S.W.3d 487, 488 (Tex. Crim. App. 2004); *Reese v. State*, 33 S.W.3d 238, 239 (Tex. Crim. App. 2000).

[4] The record is silent regarding the size of the screen, but it was assuredly much larger than the exhibits themselves. The record reflects that the lights were turned off to view the documents on screen, and both the prosecutor and Brown used a laser pointer on several occasions to identify certain details in the photographs depicted on the screen. (3 RR 53-60).

regarding how they dragged the body from Wilson's apartment to the house across the street and the State offered other photographs depicting the path they took dragging the body and the place where they left the body.

State's Exhibit 25 depicts the sword "used to chop up" Edwards's body. (3 RR 61) The admission of this photograph was unnecessary as Brown graphically described Wilson's actions with the sword.

State's Exhibits 34 and 35 depict the bloodied flashlight Wilson "used to smash Miss Edwards' face in." Again, these exhibits were cumulative of Brown's graphic testimony regarding Wilson's actions that night.

Finally, State's Exhibit 31 depicts Wilson's flat-screen television covered with "blood and skin and brain matter." (3 RR 61) This photograph is grossly prejudicial and, at best, marginally probative. It belies logic or common sense to say that the probative value of this photograph in particular is not substantially outweighed by the danger of unfair prejudice.

And collectively, the challenged photographs appealed to the trial judge's emotions and encouraged her to make her punishment decision on

an emotional basis without regard to the logical probative force of the evidence. *See Erazo*, 144 S.W.3d at 495; *Reese*, 33 S.W.3d at 242.

### *Time Needed to Develop Evidence*

The State did not devote an inordinate amount of the trial to the admission of the complained-of photographs or the testimony describing them. *Id..*

### *The State's Need for This Evidence*

> There are three questions that the reviewing court should answer when addressing this factor: "Does the proponent have other available evidence to establish the fact of consequence that the [photograph] is relevant to show? If so, how strong is that other evidence? And is the fact of consequence related to an issue that is in dispute?"

*Erazo*, 144 S.W.3d at 495-96 (quoting *Montgomery*, 810 S.W.2d at 390).

The relevant facts of consequence sought to be established by the photographs were Wilson's culpable mental state and the extent of Edwards's injuries. *See Miller-El*, 782 S.W.2d at 896. However, Wilson pleaded guilty, and the other unchallenged evidence unquestionably established the extent of Edwards's injuries. Therefore, the complained-of photographs were offered as additional proof of undisputed issues. *See Erazo*, 144 S.W.3d at 496; *Reese*, 33 S.W.3d at 242.

*Weighing the Factors*

Considering (1) the graphic nature of the photographs and the emotional impact they doubtless had on the trial judge; (2) the fact that Wilson pleaded guilty to the offense; and (3) the State's limited need to establish the undisputed facts regarding the extent of Edwards's injuries or Wilson's culpable mental state; the probative value of the challenged photographs was substantially outweighed by the danger of unfair prejudice. *See Erazo*, 144 S.W.3d at 496; *Reese*, 33 S.W.3d at 242-43. Although the photographs did have probative value and the State used a limited amount of time to introduce them in evidence, "these factors are not enough to overcome the prejudicial qualities of the photograph[s] and the State's limited need for the photograph[s] in the context of the [undisputed] issues." *See Reese*, 33 S.W.3d at 243.

*Similar Cases*

Counsel has located other decisions in which similar photographs were ruled admissible in the face of a Rule 403 (or similar) objection. These cases are all distinguishable.

In *Craig v. State*, 347 S.W.2d 255 (Tex. Crim. App. 1961), the trial court admitted four color photographs that "exhibited a gory scene created by

blood and brain matter from the deceased's wounds."[5]  *Id.* at 261. The Court held that the photographs were not impermissibly "inflammatory and prejudicial" because they tended to refute the defense's theory of the case that the victim's death was accidental. *See id.* at 261-62. *Craig* is distinguishable from Wilson's case because the cause of death was disputed.

In *Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999), the appellant complained about the admission of eight color photographs, one of which depicted "a close up of the victim's face with brain matter extruded through the large wound on the side of the head." *Id.* at 236-37. *Chamberlain* is distinguishable because the defendant in that case contested his guilt. *Id.* at 236-37.

Finally, in an unpublished memorandum opinion in *Aviles v. State*, No. 05-07-00477-CR, 2008 WL 1850779 (Tex. App.—Dallas Apr. 28, 2008, pet. ref'd) (mem. op., not designated for publication), the appellant complained of the admission of four crime-scene photographs and seven

---

[5]     This is how the Court of Criminal Appeals phrased Craig's contention regarding what the photographs depicted. *Craig v. State*, 347 S.W.2d 255, 265-66 (Tex. Crim. App. 1961).

autopsy photographs. *Id.* at *7. Two of the crime-scene photographs depicted "the street with blood, tire tracks, and a portion of brain matter." *Id.* Two of the autopsy photographs provided a "graphic" depiction of the victim's head injuries in which the "entire top of the head was split open" and the brain "expelled out of the head." *Id.* at *8. *Aviles* is likewise distinguishable because the defendant contested his guilt.

Unlike, these cases, Wilson admitted his guilt and did not in any manner dispute the cause of death or the extent of Edwards's injuries. Thus, these cases do not offer support for the admission of the complained-of photographs.

For the foregoing reasons, the trial court abused its discretion by admitting the challenged photographs in evidence.

**E. The Error Affected Wilson's Substantial Rights**

This is non-constitutional error so harm is assessed under Rule of Appellate Procedure 44.2(b). *See* TEX. R. APP. P. 44.2(b); *Reese*, 33 S.W.3d at 243; *Sandoval v. State*, 409 S.W.3d 259, 287 (Tex. App.—Austin 2013, no pet.). Rule 44.2(b) requires reversal if the error affected the defendant's

substantial rights. TEX. R. APP. P. 44.2(b). Wilson's substantial rights were affected by the erroneous admission of these prejudicial photographs.

> A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. In assessing the likelihood that the jury's decision was adversely affected by the error, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire and whether the State emphasized the error.

*Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005) (footnotes omitted); *accord Sandoval*, 409 S.W.3d at 287-88.

> [I]f the reviewing court has "a grave doubt" that the result was free from the substantial influence of the error, then it must treat the error as if it did. "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Thus, "in cases of grave doubt as to harmlessness the petitioner must win."

*Burnett v. State*, 88 S.W.3d 633, 637-38 (Tex. Crim. App. 2002) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435-37, 115 S. Ct. 992, 994-95, 130 L. Ed. 2d 947 (1995) (other citations omitted); *accord Sandoval*, 409 S.W.3d at 288.

The State advised the trial court at the beginning of the sentencing phase that it would be relying on a number of exhibits. (3 RR 6).

The State relied primarily on photographs as its physical evidence. The other two significant pieces of physical evidence were the 9-1-1 recording and the autopsy report. Notably, the 29 unchallenged photographs were rather innocuous in comparison to the 7 that form the basis of Wilson's appellate complaint. These prejudicial photographs were projected before the trial judge on a large screen, thus magnifying their prejudicial effect. These photographs appealed to the trial judge's emotions and encouraged her to improperly make her punishment decision on an emotional basis without regard to the logical probative force of the evidence.

The erroneously-admitted photographs were indelibly etched in the mind of the trial judge. After viewing these photographs, this Honorable Court will at best find itself "in virtual equipoise as to the harmlessness of the error." *See O'Neal*, 513 U.S. at 435, 115 S. Ct. at 994; *Burnett*, 88 S.W.3d at 637-38. If so, the Court must find, as Wilson contends, that the error affected his substantial rights. *Id.*

**Summary**

The trial court abused its discretion by admitting photographs in violation of Rule 403. This error cause Wilson to suffer harm. Therefore, the Court should reverse the judgment as to punishment and remand this cause for a new punishment trial. *See* TEX. CODE CRIM. PROC. art. 44.29(b); TEX. R. APP. P. 43.2(d); *State v. Davis*, 349 S.W.3d 535, 540 (Tex. Crim. App. 2011).

# Prayer

WHEREFORE, PREMISES CONSIDERED, Appellant Daniel Lorenzo Wilson prays that the Court reverse the judgment and remand this cause to the trial court for further proceedings and grant such other and further relief to which he may show himself justly entitled.

Respectfully submitted,


   */s/ Alan Bennett*
E. Alan Bennett
SBOT #02140700
Attorney for Appellant

Sheehy, Lovelace & Mayfield, P.C.
510 N. Valley Mills Dr., Ste. 500
Waco, Texas  76710
Telephone:        (254) 772-8022
Fax:          (254) 772-9297
Email:        abennett@slmpc.com

## Certificate of Compliance

The undersigned hereby certifies, pursuant to Rule of Appellate Procedure 9.4(i)(3), that this computer-generated brief contains 5,942 words.

*/s/ Alan Bennett*
E. Alan Bennett

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of this brief was electronically served to counsel for the State, Bob Odom, bob.odom@co.bell.tx.us, on August 24, 2015.

*/s/ Alan Bennett*
E. Alan Bennett